**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-00500-NYW-STV

ANTARCTICA FILMS ARGENTICA, S.A.,
ANTARCTICA FILMS, INC., and
ANTARCTICA MANAGEMENT, LLC, f/k/a DABAMMA, LLC,

      Plaintiffs,

v.

GAIA, INC.,

      Defendant.

---

## ORDER ON MOTION TO DISMISS

---

This matter is before the Court on Defendant Gaia, Inc.'s ("Gaia") Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion to Dismiss" or "Motion"). [Doc. 34, filed June 28, 2022]. The Court concludes that oral argument would not materially assist in the resolution of this Motion. Accordingly, upon careful review of the Motion and corresponding briefing, the entire case file, and the applicable case law, the Court respectfully **DENIES** the Motion to Dismiss for the reasons stated herein.

## BACKGROUND

The following facts are drawn from the First Amended Complaint and Jury Demand ("First Amended Complaint"), [Doc. 28], unless otherwise indicated, and are taken as true for the purposes of the instant Motion. This copyright infringement action arises from Defendant Gaia's alleged infringement of works created and produced by Plaintiffs Antarctica Films Argentina, S.A., Antarctica Films, Inc., and Antarctica Management, LLC f/k/a Dabamma, LLC (collectively, the "Plaintiffs" or "Antarctica"). Antarctica produces film and television works, and is controlled

by Fernando Carranza ("Mr. Carranza").  [*Id.* at ¶¶ 5–7].  Defendant Gaia "is a media company that produces and distributes video content."  [Doc. 34 at 6].

Antarctica's creative works at the center of this litigation comprise a documentary feature film and a television series—collectively titled *El Recordador* (translation: *The Rememberer*)— that are focused on the experiences of an individual named Matias De Stefano ("Mr. De Stefano"). [Doc. 28 at ¶¶ 19, 23–24].  Specifically,  Mr. De Stefano claims that he has lived many different lives spanning thousands of years and has the ability to recall all of his past lives.  [*Id.* at ¶¶ 14– 15, 67].  The plot of the documentary and television series is focused on Mr. De Stefano's character, who "explain[s] the fictional account of his many different lives, in various locations including Egypt, Atlantis, Scandinavia, and planet 'Gludock', during which he learned a unique perspective of how the world and human civilizations were created."  [*Id.* at ¶ 24].  In addition, Mr. De Stefano's character discusses "the creation of the universe and its continued existence through various 'dimensions', including 'unity', 'consciousness', 'time', and 'space', as examples."  [*Id.* at ¶ 25].  He also references locations he "believes existed before human civilization, such as 'Khefislion', a land which later became Atlantis, 'Khem', a land which later became Egypt, and 'Ekaron' which later became one of the Canary Islands, as just a few examples."  [*Id.* at ¶ 69].  Mr. De Stefano's character further references "fictional characters" such as "the 'SEM People' – an alien cone-head like species from another planet, and 'Shiw' – one of De Stefano's claimed previous identities, as further examples."  [*Id.* at ¶ 70].

To develop these works, Antarctica executed two agreements with Mr. De Stefano.  The first is a "Representation and Management Agreement" ("Management Agreement") dated September 20, 2017, under which Antarctica obtained "the exclusive rights to the image" and "intellectual property" of Mr. De Stefano in the United States and non-Spanish speaking countries.

[*Id*. at ¶ 18; Doc. 28-1; Doc. 28-2].[1]   The second is a Production Agreement dated January 22, 2018, which provided that: (1) Antarctica would produce *El Recordador*, (2) Mr. De Stefano would provide the script for the same, and (3) Antarctica would receive all of Mr. De Stefano's rights in that script.   [Doc. 28 at ¶¶ 19–21]; *see also* [Doc. 28-3; Doc. 28-4].   Antarctica began filming footage for *El Recordador* in January 2018, with additional filming and production completed by February 2019.   [Doc. 28. at ¶¶ 27, 32–33].

***Antarctica's 2018 and 2019 Meetings with Gaia.***   In March 2018, Mr. Carranza contacted Melissa Tittl ("Ms. Tittl"), the Director of Original Content at Gaia, to gauge whether Gaia could be interested in distributing *El Recordador*.   [*Id.* at ¶¶ 29–30].   Mr. Carranza allegedly "explained to Tittl the plot and concept" for *El Recordador* and "advised Tittl that he had an exclusive agreement with De Stefano to produce the documentary film and television series."   [*Id.* at ¶ 30].   Ms. Tittl expressed interest in the project, and advised Mr. Carranza to send a "trailer and pitch" when those items became available for her to review.   [*Id.* at ¶ 31]; *see also* [Doc. 28-5].

In April 2019, Plaintiff debuted the completed *El Recordador* documentary at an industry screening event in Cannes, France.   [Doc. 28 at ¶ 37].   The next month, Plaintiff presented the documentary to a select group of viewers at a screening in Los Angeles, California.   [*Id.* at ¶ 38].

In June 2019, Mr. Carranza met with representatives from Gaia to discuss Gaia's interest in licensing the documentary and television series, "and to discuss the nature of Plaintiffs' contractual relationship with [Mr.] De Stefano."   [*Id.* at ¶¶ 42–43].   At the meeting, Mr. Carranza detailed "the premise, plot, theme, concept and filming locations" for the documentary and television series.   [*Id.* at ¶ 44].   Mr. Carranza also "reiterated" to Gaia (1) "that Antarctica had an

---

[1] Antarctica entered the Management agreement with non-party Yosoy Uno, LLC ("Yosoy"). [Doc. 28 at ¶ 13].   According to Plaintiff, "[a]t the time of the Management Agreement, Yosoy was the purported agent of" Mr. De Stefano.   [*Id.* at ¶ 14].

exclusive agreement with De Stefano for the production of *El Recordador*,[2] . . . including any prequels, sequels, and/or spin-offs," and (2) that Plaintiff "had the exclusive rights pursuant to the Management Agreement over any professional video production done with De Stefano." [*Id.* at ¶¶ 45–46]. In addition, Gaia informed Mr. Carranza that it was "considering creating a brief 'interview series' with De Stefano, which would not be in any way similar to *El Recordador*, and Gaia "agreed to provide the video footage for the 'interview series' to Carranza for his preview and vetting before the program was made public to ensure there were no substantial similarities." [*Id.* at ¶ 48]. However, Gaia never provided the footage to Mr. Carranza. [*Id.*].[3]

**Gaia Produces Initiation.** Plaintiffs allege that Mr. De Stefano made a separate deal with Gaia to produce a television series called *Initiation*. [*Id.* at ¶ 34]. Filming and production for Season 1 of *Initiation* began in or around May 2019—i.e., around the same time that Plaintiff debuted *El Recordador* in Cannes and Los Angeles. [*Id.* at ¶¶ 36–38]. According to Plaintiffs, *Initiation* is "identical" to *El Recordador* in that they share the same "details of plot, themes, dialogue, shooting locations, and more." [*Id.* at ¶¶ 34–35]; *see also* [*id.* at ¶¶ 66–70, 82–84, 95–96 (describing the alleged similarities)]. The first four episodes of *Initiation* premiered on Gaia's streaming service in October 2019, and the remaining episodes of the first season, as well as subsequent seasons, became available sometime thereafter. [*Id.* at ¶¶ 65, 71–72]. Plaintiffs subsequently initiated this action against Gaia. *See* [Doc. 1].

---

[2] Plaintiffs use quotation marks when referring to the various works in this action. *See, e.g.*, [Doc. 28 at ¶ 19]. However, for clarity, the Court will refer to the works using italics, even when quoting Plaintiffs' allegations or arguments.

[3] Mr. Carranza also met with Gaia in September 2019 to discuss Defendant's continued interest in licensing the documentary and television series. [Doc. 28 at ¶¶ 54, 57]. However, by that time, Antarctica had already reached a licensing agreement with another entity. [*Id.* at ¶¶ 58, 61].

In the operative First Amended Complaint, Plaintiffs assert five claims: (1) direct copyright infringement pursuant to 17 U.S.C. § 501 ("Count I"); (2) contributory copyright infringement pursuant to 17 U.S.C. § 501 ("Count II"); (3) inducement of copyright infringement pursuant to 17 U.S.C. § 501 ("Count III"); (4) vicarious copyright infringement pursuant to 17 U.S.C. § 501 ("Count IV"); and (5) intentional interference with contractual relations ("Count V").  [Doc. 28 at ¶¶ 97–153].

On June 28, 2022, Gaia filed the instant Motion to Dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which has since been fully briefed.  *See* [Doc. 34; Doc. 44; Doc. 49].  The Motion is thus ripe for disposition.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, and a "formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "'across the line from conceivable to plausible.'" (citation omitted)).  Courts must ultimately "determine whether the complaint sufficiently alleges facts supporting all the

elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Gaia moves to dismiss each of Antarctica's claims for failure to state a claim, and also requests dismissal of the First Amended Complaint with prejudice. [Doc. 34]. The Court will address each claim in turn.

## I.     Direct Copyright Infringement (Count I)

To state a claim for direct copyright infringement, a plaintiff must allege two elements: "(1) ownership of a valid copyright, and (2) copying by the defendant of protected components of the copyrighted material." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 832, 831 (10th Cir. 1993). Here, Gaia argues that Antarctica fails to allege facts to support the second element. [Doc. 34 at 7].[4]

The second element of a copyright infringement claim is broken down into two separate components: first, whether the defendant in fact copied portions of the plaintiff's work; and second, whether there is "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (citation omitted). "This second component determines whether a defendant's factual copying constitutes infringement." *Id.* (quotation omitted).

"To decide the substantial similarity issue, a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to the accused work." *Id.* "A court may address either step first." *Id.*; *see also Tufenkian*

---

[4] The Court cites to the page numbers generated by the CM/ECF system, not the page numbers used by the Parties.

*Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134–35 (2d Cir. 2003) ("The court, confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.").

Notably, the Parties' respective works at issue are not attached to the First Amended Complaint, and the Parties do not include them with their briefs.[5]  Therefore, the resolution of the instant Motion with respect to Plaintiffs' infringement claims will necessarily be based on the allegations in the First Amended Complaint, and not the works at issue themselves.  *Cf. Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002) ("When a district court considers the original work and the allegedly copyrighted work in deciding a 12(b)(6) motion, the legal effect of the works are determined by the works themselves rather than by allegations in the complaint.").

### A.      Protected Elements: Legal Framework

In its Motion, Gaia argues that Plaintiffs have not sufficiently alleged "copying of protected elements."  [Doc. 34 at 7]; *see also Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014)

---

[5] In the Motion to Dismiss, Defendant argues that "Plaintiffs did not submit copies of the Works with the FAC and, despite requests, have thus far declined to provide copies enabling comparison, providing only a single episode."  [Doc. 34 at 6 n.3].  Presumably, Defendant has access to Plaintiffs' *El Recordador* documentary and television series because they are publicly available, and because Plaintiffs allege that the Parties engaged in licensing discussions regarding *El Recordador* and that Defendant's Head of Content Acquisition sent an email to Plaintiffs "expressing that she "watched [it], loved it and agree[d] with [Gaia's Director of Original Content] that it's perfect for Gaia and [their subscribers]."  [Doc. 28 at ¶¶ 29–31, 35, 42–52, 54–59].  In addition, this Court notes that the Parties stipulated to the exchange of Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) on or before the date of a rescheduled Scheduling Conference.  [Doc. 26].  The Honorable Scott T. Varholak scheduled a Scheduling Conference for March 1, 2023, which was vacated upon the filing and entry of an Amended Scheduling Order.  [Doc. 53; Doc. 56; Doc. 57].  Accordingly, this Court presumes that at this juncture, Defendant has access to Plaintiffs' *El Recordador* documentary and television series.

("On a motion to dismiss, a district court may assume that 'actual copying' occurred and proceed directly to the question of 'substantial similarity.'" (citing *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63–64 (2d Cir. 2010))).

Under Section 102(a) of the Copyright Act, a copyright protects the "original works of authorship fixed in any tangible medium of expression," including "motion pictures and audiovisual works." 17 U.S.C. § 102(a). To obtain protection, the work must demonstrate "at least some minimal degree of creativity," but "even a slight amount will suffice." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* (quotation omitted). However, "legal protection does not extend to all aspects of a copyrighted work." *Blehm v. Jacobs*, 702 F.3d 1193, 1200 (10th Cir. 2012). Section 102(b) of the Act provides that

> [i]n no case does copyright protection for an original work . . . extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b). This provision codifies a "fundamental tenet" that copyright "protection extends only to the author's original expression and not to the ideas embodied in that expression." *Gates Rubber Co.*, 9 F.3d at 836; *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("[N]o author may copyright facts or ideas."); *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005) ("Even assuming the two photographs share substantial similarities, there is no infringement unless protectible elements were copied."); *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) ("What is protected is the original or unique way that an author *expresses* [his] ideas, concepts, principles or processes.").

As a result, "the copyright of a nonfiction work protects only 'those aspects of the work—termed expression—that display the stamp of the author's originality.'" *Jacobsen*, 287 F.3d at 942 (quoting *Harper & Row*, 471 U.S. at 547); *see also Feist*, 499 U.S. at 348 ("[C]opyright protection may extend only to those components of a work that are original to the author.").  "[A] copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example, . . . facts[] or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions." *Harper & Row*, 471 U.S. at 548.

Accordingly, "courts comparing works must first distill the protectable elements of the copyrighted work—i.e., determine what aspects constitute protectable expression." *Blehm*, 702 F.3d at 1200.  However, this process, "although sound in theory, is often difficult to apply in practice." *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1285 (10th Cir. 1996).  This difficulty arises "[b]ecause the idea/expression distinction is 'the most complex part of the substantial similarity inquiry.'" *Blehm*, 702 F.3d at 1201 (quoting *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004)); *see also Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971) ("The critical distinction between 'idea' and 'expression' is difficult to draw.").  Thus, every case does not require extensive analysis, and the appropriate test for separating unprotectable ideas from protectable expression "may vary depending upon the claims involved, the procedural posture of the suit, and the nature of the works at issue." *Blehm*, 702 F.3d at 1200 n.4 (quotation omitted).  The Tenth Circuit follows a "case-by-case approach, . . . mindful 'that copyright law seeks to achieve a proper balance between competition based on public ideas and incentive to produce original work[.]'" *Id.* at 1201 (citing *Country Kids*, 77 F.3d at 1285); *see also Harper & Row*, 471 U.S. at 547 ("The copyright is limited

to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

One such approach is known as the "abstraction-filtration-comparison" test. *Blehm*, 702 F.3d at 1200 n.4. "At the abstraction step, [courts] separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work." *Country Kids*, 77 F.3d at 1284–85. Following the abstraction analysis, a court must "filter out the nonprotectable components of the product from the original expression." *Id.* at 1285. Relevant to this case, such filtering may involve the doctrine of "*scenes a faire*,"[6] under which copyright protection is denied "to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Gates Rubber Co.*, 9 F.3d at 838. "The *scenes a faire* doctrine also excludes from protection those elements of a [work] that have been dictated by external factors." *Id.*; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("Neither does copyright protection extend to copyright or 'stock' themes commonly linked to a particular genre.").

After nonprotectable aspects of the work have been filtered, a court must "compare the remaining protected elements to the allegedly copied work to determine if the two works are substantially similar." *Country Kids*, 77 F.3d at 1285. Specifically, "the court must find that the defendant copied protectable elements of the plaintiff's [work] and that those protectable elements comprise a substantial part of the plaintiff's [work] when it is considered as a whole." *Gates Rubber Co.*, 9 F.3d at 833.

---

[6] Although "proper spelling of this phrase includes *accents grave*, *i.e.*, '*scènes à faire*[,]' . . . [m]ost case law regarding this concept drops the accent marks," *Stouffer v. Nat'l Geographic Partners, LLC*, 400 F. Supp. 3d 1161, 1186 n.16 (D. Colo. 2019), and therefore the Court will do the same here, including when citing the Parties' arguments.

Moreover, although "[c]areful scrutiny is necessary when the protected work contains unprotectible elements," *Bill Diodato Photography*, 388 F. Supp. 2d at 390, the Court is "principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringed work, as instructed by [the court's] good eyes and common sense." *Gaito Architecture*, 602 F.3d at 66 (quotations and citations omitted); *accord Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014) ("[T]he adjudication will often turn on the factfinder's direct comparison of the original and the infringing works, *i.e.,* on the factfinder's 'good eyes and common sense' in comparing the two works' 'total concept and overall feel.'" (quoting *Gaito Architecture*, 602 F.3d at 66)).

### B.   Application: *El Recordador* vs. *Initiation*

As noted above, neither side provided the works to the Court and therefore, any actual comparison is not possible.  This Court also is mindful that at this stage, Plaintiffs need not allege the protectable elements of its works or to make a side-by-side comparison.  *See Kipp Flores Architects, LLC v. Pradera SFR, LLC*, No. SA-21-cv-00673-XR, 2022 WL 1105751, at *4 (W.D. Tex. Apr. 13, 2022).  With respect to Count I, Plaintiffs allege that the first four episodes of *Initiation* are "virtually identical" to *El Recordador* because both shows "featured [1] a single character and narrator, Matias De Stefano, who [2] told the story of the creation of the universe and human civilizations through the lens of various 'dimensions' or alternate realities, which he experienced in his many previous lives spanning thousands of years."  [Doc. 28 at ¶ 67].  For support, Plaintiffs allege the following similarities between the works, among others:

- *El Recordador* and *Initiation* "take[] the viewer through an explanation of each 'dimension', beginning with 'Unity,' and progressing in a substantially similar

sequence through 'mind,' 'thoughts,' 'consciousness,' 'time,' and 'space[.]'" [*Id.* at ¶ 68].

- The works "include[] references to locations which De Stefano believes existed before human civilization, such as 'Khefislion,' a land which later became Atlantis, 'Khem,' a land which later became Egypt, and 'Ekaron' which later became one of the Canary Islands[.]" [*Id.* at ¶ 69].

- They "feature[] references to the same fictional characters – the 'SEM People' – an alien cone-head like species from another planet, and 'Shiw'– one of De Stefano's claimed previous identities[.]" [*Id.* at ¶ 70].

- Episode 1 of each work is titled "Unity," and describes how all existence stems from the same place of unity; Episode 2 of each work concerns time and space; Episode 3 of each work concerns a "trinity" of forces; and Episode 4 of each work concerns four "pillars" of reality. [*Id.* at ¶ 83].

[Doc. 44 at 10].

Gaia does not challenge the existence of substantial similarities between *El Recordador* and *Initiation*. Instead, it argues that Antarctica's "allegations of copying fail for the principal reason that they relate to unprotectable ideas, tropes and/or *scenes a faire* common to the genre of new age spirituality" and represent "only the general idea of a plot involving the creation of the universe, alternate dimensions, and past lives." [Doc. 34 at 8]. For support, Gaia contends that the descriptions of the "plots and themes" of *El Recordador* and *Initiation* in the First Amended Complaint—specifically regarding "the origin of the universe and ancient civilizations, alternate dimensions, and concepts of unity, mind, thoughts, consciousness, time and space"—constitute "common elements of modern or new age spirituality and popular culture, and thus are not afforded

copyright protection." [*Id.*]. Gaia similarly argues that featuring Mr. De Stefano as a single narrator "describes only an unprotectable casting idea and a *scene a faire* common to documentaries." [*Id.*]. In addition, Gaia contends the First Amended Complaint fails to plead any protected "sequence of events" because "any sequencing stems naturally from [Mr.] De Stefano's believed experience and story [and] is thus unprotected." [*Id.* at 9]. Gaia further argues that the "plot[s]" of *El Recordador* and *Initiation* are not protected because they "consis[t] solely of [Mr.] De Stefano's believed experiences and history as he understands it," and "[h]istorical facts and events . . . are not protected by copyright." [*Id.* (citation omitted)].

In its Response, Antarctica counters that "[t]he creative works at-issue are fantastical, fictional accounts," and argues that its allegations in the First Amended Complaint (referenced above) "allege more than just the copying of 'stock scenes'"; and, given their detail, "it would be improper to dismiss Antarctica's direct infringement allegations at the pleadings stage." [Doc. 44 at 10–11]. Antarctica also references its allegation that one of Mr. De Stefano's past lives is based on his time on a fictional planet called "Gludock," *see* [Doc. 28 at ¶ 24], and contends that

> [e]ven assuming . . . it is a ***fact*** that De Stefano is from the Planet Gludock and has lived repeatedly over millennia, Antarctica's choices in organizing, selecting and arranging those 'facts' reflect artistic input, and qualify *El Recordador* for copyright protection.

[Doc. 44 at 12 (emphasis in original)].

The Court finds that Antarctica has adequately pled a direct infringement claim. The relevant issue here is whether Gaia "copied only unprotected facts or instead impermissibly copied [Antarctica's] original expression." *Jacobsen*, 287 F.3d at 942. As mentioned above, Gaia contends, *inter alia*, that (1) Mr. De Stefano's ideas discussed in *El Recordador* and *Initiation* "relate to unprotectable ideas, tropes, and/or *scenes a faire* common to the genre of new age spirituality," and Plaintiffs' allegations of Gaia's copying were limited to "only the general idea

of a plot involving the creation of the universe, alternate dimensions, and past lives"; (2) the casting of Mr. De Stefano as a "single narrator" is not a unique element of the works at issue; (3) the "sequence of events" in those works "stem[] naturally from [Mr.] De Stefano's believed experience and story" which are "unprotected"; and (4) relatedly, "the alleged 'plot' of the Works . . . consists solely of [Mr.] De Stefano's believed experiences and history as he understands it" and, therefore, are not protectable.  [Doc. 34 at 8–10].

However, even setting aside for the moment the idea of a "single narrator" and that the "plot" of *El Recordador* relates generally to "the creation of the universe, alternate dimensions, and past lives," [*id.* at 8], Gaia does not explain how Mr. De Stefano's "believed experience" regarding his past lives constitute unoriginal contributions to the subject of "new age spirituality." For instance, Gaia fails to explain how "elements of modern or new age spirituality," [*id.*], exist in the public domain related to Mr. De Stefano's beliefs about the planet "Gludock," other locations such as "Khefislion" and "Ekaron," or the "SEM People"—"an alien cone-head like species from another planet."  *See* [Doc. 28 at ¶¶ 24, 69–70].  Nor does Gaia sufficiently address how the "sequence of events" in *El Recordador* and *Initiation* are unprotected solely because *any* such sequencing "stems *naturally* from [Mr.] De Stefano's believed experience and story" regarding these subjects.  [Doc. 34 at 9 (emphasis added)].  Indeed, given Gaia's broad definition of the theme of "new age spirituality,"[7] it is unclear how—based solely on the allegations in the First Amended Complaint—Mr. De Stefano's personal beliefs and ideas arise "naturally" from that subject.

---

[7] As mentioned, Gaia states that "*the origin of the universe and ancient civilizations, alternate dimensions, and concepts of unity, mind, thoughts, consciousness, time and space,* are common elements of modern or new age spirituality and popular culture, and thus are not afforded copyright protection."  [Doc. 34 at 8 (emphasis added)].

Gaia cites *ITN Flix, LLC v. Univision Holdings, Inc.*, No. 2:15-cv-00736-DN, 2016 WL 6496224, at *1 (D. Utah Nov. 2, 2016), to support that the First Amended Complaint "pleads copying of only the general idea of a plot involving the creation of the universe, alternate dimensions, and past lives" but "fail[s] to identify particular expressions that are protectable." [Doc. 34 at 8]. However, Gaia's reliance on that case is misplaced. The plot ideas in *ITN Flix* were based on elements "common to a vigilante theme or setting," including that "(1) both films are about law enforcement officers who take vengeance on a person who killed his wife and daughter, and does so by obtaining information on the streets; (2) both films end with a scene between a priest and a bad man; and (3) the lead actor in both films is Danny Trejo." *ITN Flix*, 2016 WL 6496224, at *4–5. And the court found that the plaintiff failed to identify "protected *expressions*" that were duplicated—such as "specific lines, costumes, scenery, or other expressions"—and instead relied on "general conclusions" that its film was "copied" or "duplicated." *Id.*; *see also id.* at *5 ("Several elements Plaintiffs identify, such as a vigilante seeking a villain, a vigilante obtaining information on the streets, and a vigilante seeking revenge or vengeance against a person who has wronged the vigilante, are elements that are 'standard,' 'stock,' or 'common' to the vigilante theme or setting.").

Here, on the other hand, Antarctica's allegations include that in *El Recordador* and *Initiation*, Mr. De Stefano discusses specific nonexistent planets and species. *See, e.g.*, [Doc. 28 at ¶¶ 68–70, 83]; *see also ITN Flix*, 2016 WL 6496224, at *4 ("The Complaint must contain factual allegations about protected expressions, not merely conclusions that the general plot ideas or characters have been duplicated.").[8]

---

[8] Gaia also cites *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133–34 (C.D. Cal. 2007), for the proposition that "basic plot ideas are not protected." [Doc. 34 at 8, 9 (brackets and quotation marks omitted)]. However, that case dealt with "the individual generic elements of cooking shows and talk shows—i.e., a host, guest celebrities, an interview, and a cooking segment." *Zella*, 529

In addition, the Court is not persuaded by Gaia's argument in its Reply that Plaintiffs attempt, in their Response, to reframe the works at issue "as nothing more than a 'creative story' of 'fantastical fiction.'"   [Doc. 49 at 5]; *see also* [*id.* at 7 (arguing that Plaintiffs "desperately characteriz[e] the Works' content as 'fantastical,' 'fictional,' and 'outrageous,' and belatedly qualify[] the Works as 'not a traditional documentary'")].   Indeed, Plaintiffs allege in the First Amended Complaint that *El Recordador* discusses "the *fictional account* of [Mr. De Stefano's] many different lives . . . during which he learned a unique perspective of how the world and human civilizations were created."   [Doc. 28 at ¶ 24 (emphasis added)].   While "a central tenet of copyright law is that only a copyright owner's particular expression of his or her idea is protected, not the idea itself,"[9] *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 440 (S.D.N.Y. 2011), *aff'd sub nom. Muller v. Anderson*, 501 F. App'x 81 (2d Cir. 2012), taking the First Amended Complaint's averments as true (including Plaintiffs' allegations of intentional copying), [Doc. 28 at ¶ 35], the Court disagrees with Gaia's assertion that Antarctica attempts to use its Response to "rewrite" the First Amended Complaint in order to "change the nature of the Works" at issue.   [Doc. 49 at 5].   And Plaintiffs need not prove their claim at this stage.   *See Colón-Colón v. Wapa Tv*, CV 19-1825 (SCC), 2021 WL 838417, at *3 (D.P.R. Mar. 1, 2021) (in a copyright infringement action, observing that "[a]t the pleadings stage, the plaintiffs need not prove the elements of their claim, but they must sufficiently allege facts that show that the claim is plausible on its face" (quotation omitted)); *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 1:17-cv-1973, 2019 WL 11025902, at *2 (N.D. Ill. June 21, 2019) ("Thus, Motorola need not

---

F. Supp. 2d at 1133.  Gaia does not explain how that case applies here with respect to "new age spirituality."

[9] 17 U.S.C. § 102(b) provides "In no case does copyright protection for an original work of authorship extend to any idea . . . [or] concept . . . regardless of the form in which it was described, explained, illustrated, or embodied in such a work."

prove its case at this juncture by specifically alleging the exact lines of code that Hytera copied from the DMR Program, or the exact products in which Hytera implemented the copied code. Rather, such factual details may be uncovered through discovery and addressed at summary judgment or trial.").

The Court similarly is not persuaded, at this juncture, by Gaia's characterization of Mr. De Stefano's ideas in the works as "bare 'facts'" that are not entitled to copyright protection. [Doc. 34 at 9–10]. The Court notes that Plaintiffs allege "[Mr.] De Stefano is an individual who believes he has lived many different lives spanning hundreds of years, and that he has the ability to recall all of them." [Doc. 28 at ¶ 15]. But they further aver "[t]he unique plot of both the Documentary and the TV Series, as created, portrayed, and expressed by Tomio and Antarctica, was centered around [Mr.] De Stefano. In both the Documentary and TV Series, [Mr.] De Stefano's 'character' explained the fictional account of his many different lives, in various locations including Egypt, Atlantis, Scandinavia, and planet 'Gludock', during which he learned a unique perspective of how the world and human civilizations were created." [*Id.* at ¶ 24]. In addition to Plaintiffs' characterization of Mr. De Stefano's account as "fictional," this Court cannot conclude from the four corners of the First Amended Complaint that Mr. De Stefano's story is simply a "general idea of combining philosophy and religion [that] are not afforded copyright protection." *Cf. Phillips v. Beck*, No. CIV 06-00628SOM/KSC, 2007 WL 2972605, at *8 (D. Haw. Oct. 9, 2007) (applying copyright law to books that discuss the intersection of world region and philosophy).

In sum, dismissal for failure to state a claim is only appropriate where, after considering the First Amended Complaint and attached exhibits in the light most favorable to Antarctica, "it appears beyond doubt [Plaintiffs] can prove no set of facts in support of [their] claim that would entitle [them] to relief." *Jacobsen*, 287 F.3d at 942. The Court finds that, at this stage in the

proceedings, Antarctica has sufficiently nudged their direct copyright infringement claim "across the line from conceivable to plausible" to survive dismissal. *Twombly*, 550 U.S. at 570; *see also, e.g.*, *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 728 (9th Cir. 2020) (reversing the dismissal of the plaintiffs' copyright infringement suit, and finding that, at the motion to dismiss stage, it was "difficult to know" whether or not "many of the elements the two works share[d] in common [were] unprotected generic, pirate-movie tropes," as the district court had concluded).

## II.     Contributory and Vicarious Copyright Infringement (Counts II and IV)

Contributory and vicarious copyright infringement "are well established in the law and are grounded in common law principles of secondary liability." *Shell v. Am. Fam. Rights Ass'n*, 899 F. Supp. 2d 1035, 1057 (D. Colo. 2012). "Contributory copyright infringement occurs when a defendant induces or encourages direct infringement and vicarious infringement occurs when a defendant profits from direct infringement while declining to exercise a right to stop or limit it." *Id.* "To state a claim of contributory copyright infringement, a plaintiff must allege that the defendant 'with knowledge of the infringing activity' induced, caused, or materially contributed to the infringing conduct of another." *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, No. 12-cv-02240-PAB-DW, 2013 WL 4052024, at *7 (D. Colo. Aug. 12, 2013) (quoting *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012)).

A plaintiff must do more than allege that the defendant "merely provided the means to accomplish an infringing activity" to state a claim for contributory infringement. *Id.* (citing *Grokster*, 545 U.S. at 930). "Rather, liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *Id.* Thus, here, Antarctica must allege that (1) Gaia infringed its copyrights in *El Recordador*; (2) third parties infringed Antarctica's copyrights in *El Recordador*; (3) Gaia induced, caused, or materially contributed to the third parties' infringement;

and (4) a causal connection existed between Gaia's inducement and the third parties' infringement. *See id.* (citing *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013)). On the other hand, a vicarious copyright infringement claim requires allegations that (1) a third party infringed the plaintiff's copyright; (2) the defendant had the ability to control or supervise the third party's infringing activities; (3) the defendant failed to stop the infringement; and (4) the defendant had a direct financial interest in the infringing activity. *Id.* at *8.

Here, Gaia argues that Plaintiffs have not sufficiently alleged "(1) direct copyright infringement; (2) intent to promote [or induce] infringement; and (3) [the] right and ability to supervise the infringing activity." [Doc. 34 at 11, 12]. The Court will address each challenge in turn.

**Direct Copyright Infringement.** Gaia first argues that Antarctica fails to allege direct infringement that is required to establish both of their secondary liability claims. [*Id.* at 11]. For support, Gaia references its arguments regarding the dismissal of Plaintiffs' direct infringement claim under Count I, arguing that "[t]he secondary liability claims . . . are based on the same inadequate allegations that the Works were infringed." [*Id* (citations omitted)]. "For that reason alone," Gaia continues, "these claims should be dismissed." [*Id.*]. This is Gaia's entire argument on this issue. *See* [*id.*].

The Court notes that Gaia appears to conflate the first two elements of contributory copyright infringement—i.e., whether Plaintiffs have sufficiently alleged direct copyright infringement by *Gaia* and whether they have pled direct copyright infringement by a *third party*, Mr. De Stefano. *See* [*id.* (Defendant's acknowledgment that Plaintiffs' secondary liability claims require "direct infringement by a third party")]. In any event, as discussed above, Antarctica has sufficiently pled a direct infringement claim against Gaia. Thus, it follows that Antarctica has

likewise sufficiently pled that a third party—i.e., Mr. De Stefano—also infringed on Antarctica's copyright in *El Recordador*. *See, e.g.*, [Doc. 28 at ¶ 34 ("Unbeknownst to Plaintiffs at the time, De Stefano had cut a separate deal with Defendant to provide a television series identical to *El Recordador* called *Initiation*.")]; *see also* [*id.* at ¶¶ 120–25; Doc. 44 at 14].

      ***Intent to Induce Infringement.***  Next, Gaia argues that Plaintiffs fail to allege "intent to induce infringement" to state a contributory infringement claim.  [Doc. 34 at 12].  "The inducement rule . . . premises liability on purposeful, culpable expression and conduct" that is shown by "affirmative steps taken to foster infringement."  *Grokster*, 545 U.S. at 937; *see also Viesti*, 2013 WL 4052024, at *7.  This rule does not, however, "compromise legitimate commerce or discourage innovation having a lawful promise."  *Grokster*, 545 U.S. at 937.

      Gaia contends that "[a]t most," Plaintiffs have alleged that Defendant merely provided the "means" and "financial incentives" to accomplish an infringing activity, but "such run-of-the-mill business conduct does not plausibly support Plaintiffs' conclusory allegations of inducement, or suggest that Gaia took any 'active steps to *encourage* infringement.'"  [Doc. 34 at 12 (ellipses omitted) (quoting *Grokster*, 545 U.S. at 936)]; *see also* [Doc. 49 at 11 ("The FAC's sole allegation of inducement is that Gaia purportedly provided [Mr.] De Stefano 'the means' and 'financial incentives' to infringe.")].  In Response, Plaintiffs counter that they have sufficiently pled inducement by alleging, *inter alia*, that "Gaia had actual or constructive knowledge of Antarctica's copyrights during the time of [Mr.] De Stefano's direct infringement, and that despite having such actual knowledge, Gaia provided [Mr.] De Stefano with money and encouragement to proceed with such direct infringement."  [Doc. 44 at 14 (citing [Doc. 28 at ¶¶ 34, 120–25])].

      The Court finds that Antarctica has sufficiently alleged an intent to induce infringement. For instance, Antarctica alleges that in March 2018 and June 2019, Mr. Carranza advised Gaia that

Antarctica had an exclusive agreement with Mr. De Stefano to produce *El Recordador*.  [Doc. 28 at ¶¶ 29–30, 42, 45–46].  However, "[u]pon information and belief," Mr. De Stefano began filming *Initiation* with Gaia in May 2019—i.e., between the two instances when Mr. Carranza advised Gaia about the exclusive production rights.  [*Id.* at ¶ 41].  These allegations, together with Antarctica's allegations of direct infringement by Gaia, support that Plaintiffs have sufficiently alleged that Gaia took "affirmative steps" with the intent to foster Mr. De Stefano's infringement of *El Recordador*.  *Grokster*, 545 U.S. at 937.

 ***Right and Ability to Supervise Infringement.***  Gaia further seeks dismissal of Plaintiffs' vicarious infringement claim on the basis that Plaintiffs fail to plausibly allege that "Gaia had the right, but failed, to supervise and control" Mr. De Stefano.  [Doc. 34 at 12–13].  Again, the Supreme Court has determined that a claim for vicarious infringement "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement."  *Grokster*, 545 U.S. at 930 n.9; *see also Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) ("A defendant may be vicariously liable even when he or she is not aware of the infringing activity.").

 Gaia argues that Plaintiffs' allegations in Paragraphs 133 and 134 of the First Amended Complaint—that Mr. De Stefano "reproduced the Works 'under the direction control and supervision of' Gaia, and that Gaia 'refused to exercise supervision and control over De Stefano'— fail to state a plausible claim for relief."  [Doc. 34 at 8].  Gaia also argues that "Plaintiffs do not allege any facts concerning the nature of Gaia's relationship with De Stefano."  [*Id.*].  Plaintiffs counter that the allegations cited by Gaia are sufficient to support the supervision element of their

vicarious infringement claim, and "Gaia's argument to the contrary invokes an issue for the proof stage, not the pleadings stage." [Doc. 44 at 15].

The Court finds that Plaintiffs have sufficiently alleged that Gaia had supervision over Mr. De Stefano. Plaintiffs' allegations regarding Gaia's supervision are not limited only to Paragraphs 133 and 134 of the First Amended Complaint, as Gaia claims. *See* [Doc. 34 at 8]. Rather, it is clear that Plaintiffs' allegations of supervision are supported, at least in part, by the same allegations regarding Gaia's alleged inducement of Mr. De Stefano's infringement: namely, that "[u]pon information and belief," Mr. De Stefano began filming *Initiation* with Gaia in May 2019—i.e., after Mr. Carranza advised Gaia about Antarctica's exclusive production rights as to *El Recordador*. [Doc. 28 at ¶ 41]; *see also* [*id.* at ¶ 132 ("Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 131 of this [First Amended] Complaint as if fully set forth herein.")]. Accordingly, the Court finds that Plaintiffs have adequately pled that Gaia had a right and ability to supervise Mr. De Stefano.[10] *Cf. Bell v. Chicago Cubs Baseball Club, LLC*, No. 19-cv-2386, 2020 WL 550605, at *5 (N.D. Ill. Feb. 4, 2020) (finding allegations that a Chicago Cubs employee was under the team's supervision and control were sufficient to sustain a vicarious infringement claim against the team).[11]

---

[10] In so concluding, the Court does not agree entirely with Plaintiffs' assertion that they need not allege anything more than "(1) De Stefano made derivative works under the direction, control and supervision of Gaia; and (2) Gaia failed to exercise any control over De Stefano to ensure that he did not infringe." [Doc. 44 at 15 (brackets, ellipses, and internal quotation marks omitted)].

[11] Plaintiffs cite *Bell v. Chicago Cubs Baseball Club, LLC* to support their argument, *see* [Doc. 44 at 15], and Gaia objects to the application of that case on the basis that it "concerned an *employer's* alleged control over an *employee's* conduct in the course of his *employment*" and the First Amended Complaint "does not allege an employment relationship between Gaia and De Stefano." [Doc. 49 at 12 (emphasis in original)]. However, Gaia fails to cite any authority to support that an employment relationship is required to allege the right and ability to supervise a third-party infringer or that *Bell* cannot be considered by this Court as analogous. In any event, as explained herein, Plaintiffs' allegations that Gaia (1) became aware of Antarctica's exclusive production rights with respect to Mr. De Stefano/*El Recordador* and (2) *thereafter*, commenced its own

### III.     Intentional Interference with Contract (Count V)

Under Colorado law, a claim for intentional interference with contract, also called tortious interference with contract, has five elements: "(1) existence of a contract between the plaintiff and a third party; (2) knowledge of that contract by the defendant; (3) the defendant's intentional, improper interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1120 (D. Colo. 2016) (citing, *inter alia*, *Colo. Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 170 (Colo. 1993)).

Defendants seek dismissal of Plaintiffs' intentional interference claim on the basis that Plaintiffs fail to allege "(1) knowledge; (2) intent; (3) induced breach; [and] (4) improper conduct." *See* [Doc. 34 at 13–15].  The Court respectfully disagrees.

***Knowledge of a Contract.***  In support of their intentional interference claim, Plaintiffs allege, *inter alia*, that:

> Defendant intentionally induced De Stefano to breach the Management Agreement, by asking him to consent to the production and development of at least Season 1 of *Initiation*, knowing that such content would be made available in the United States and other non-Spanish speaking countries, in violation of . . . the Management Agreement.

[Doc. 28 at ¶ 150].  Plaintiffs also allege that in March 2018—i.e., before Mr. De Stefano began filming the first season of *Initiation* in May 2019—Mr. Carranza informed Gaia, through Ms. Tittl, that Mr. De Stefano "had an exclusive agreement with De Stefano to produce the documentary film and television series."  [*Id.* at ¶¶ 30, 41].

---

production of *Initiation* with Mr. De Stefano (based on the same content as *El Recordador*) sufficiently nudges Plaintiffs' vicarious liability claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In the Motion, Gaia argues that "Plaintiffs fail to allege that Gaia knew of the Management Agreement *before* [Mr. De Stefano's] purported breach" of that contract. [Doc. 34 at 13]. Gaia also distinguishes the Management Agreement from the Production Agreement, arguing that Plaintiffs' allegation that the "exclusive agreement . . . to *produce* the documentary film and television series," [Doc. 28 at ¶ 30 (emphasis added)], refers to the Production Agreement, but not to the Management Agreement. [Doc. 34 at 13]. In other words, Gaia's argument attempts to narrow the basis of Plaintiffs' intentional interference claim solely to the Production Agreement simply because Mr. Carranza informed Gaia that Antarctica had an "exclusive agreement . . . to produce" *El Recordador*. [*Id.*].

However, even accepting that Gaia only had knowledge of the Management Agreement before 2019, that agreement expressly provides that Antarctica retained "the exclusive rights to the image, intellectual property, etc. for the *production* of films . . . and series of Matias De Stefano in film, television, . . . and any other medium written or audiovisual." [Doc. 28-2 at 1 (emphasis added)].[12] Moreover, "under Colorado law it is sufficient to show the defendant reasonably should have known of the existence of a contract." *Mueller v. Swift*, No. 15-cv-1974-WJM-KLM, 2017 WL 2362137, at *7 (D. Colo. May 31, 2017) (collecting cases); *see also Carman v. Heber*, 601 P.2d 646, 647 (Colo. App. 1979) (liability may be based on "knowledge [by the defendant] of facts which would lead him to inquire as to the existence of the contract"). Given the allegations that Antarctica and Gaia discussed in detail *El Recordador* and Mr. Carranza informed Gaia generally about an "exclusive agreement with De Stefano to produce the documentary film and television

---

[12] Plaintiffs respond that the focus of their allegation in Paragraph 30 of the First Amended Complaint "is not on 'production,' as Gaia emphasizes; it is on ***exclusivity***." [Doc. 44 at 16 (emphasis in original)]. The Court finds this argument to be immaterial for purposes of resolving the instant Motion, given the express language in the Management Agreement.

series," [Doc. 28 at ¶ 30], the Court finds that Plaintiffs have sufficiently alleged the knowledge element of their intentional interference with contract claim.

**Intent and Induced Breach.**  With respect to intent, the relevant inquiry is whether a defendant "acted for the purpose, in whole or in part, of bringing about a particular result, or if a person knows his or her acts or words are likely to bring about that result, namely, to bring about the breach or non-performance of the contract." *Mueller*, 2017 WL 2362137, at *8 (quotation and citation omitted); *see also Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 194 (Colo. App. 2012) (stating that a defendant may be liable where it "acted either for the primary purpose of interfering with the performance of the plaintiff's contract, or knowing that the interference was certain or substantially certain to occur as a result of the defendant's action").

Based on the Court's analysis and conclusion above that Plaintiffs have adequately pled their secondary copyright infringement claims, the Court also finds that Plaintiffs have sufficiently pled facts to support Gaia's intent and inducement of Mr. De Stefano's breach of the Management Agreement. Indeed, Plaintiffs allege that Mr. Carranza informed Gaia about Antarctica's "exclusive agreement" with Mr. De Stefano to produce *El Recordador*, and then Gaia went on to produce an "identical" series thereafter.  [Doc. 28 at ¶¶ 30, 34].  Thus, at a minimum, Plaintiffs have sufficiently alleged that Gaia acted with the knowledge that its production of *Initiation* was "substantially certain" to bring about Mr. De Stefano's breach of his existing agreement(s) with Antarctica.[13]

---

[13] Gaia's arguments on this issue do not persuade this Court to reach a different conclusion at this stage in the litigation, and likewise misapprehend the plausibility standard under Federal Rule of Civil Procedure 12(b)(6).  *See, e.g.*, [Doc. 34 at 14 (arguing, *inter alia*, that Plaintiffs "do not suggest Gaia pressured De Stefano or took any action indicating a purposeful intent to interfere with the Management Agreement" and "without allegations that Gaia took steps that 'specifically induced or otherwise caused' De Stefano to breach an agreement, the [First Amended Complaint] fails to plead that Gaia induced a breach at all"); Doc. 49 at 13–14 (arguing that it is not enough for Plaintiffs to allege intent based on Defendant's knowledge that Mr. De Stefano's breach "was

*Improper Conduct.*   Gaia further argues that Plaintiffs fail to allege that Gaia acted improperly, reasoning that the First Amended Complaint "merely alleges Gaia 'asked' and [Mr.] De Stefano agreed to enter into a contractual relationship," and "[a]ccording to Plaintiffs, [Mr.] De Stefano simply chose to present ideas through two different shows."  [Doc. 34 at 15].  Again, the Court disagrees with Gaia's narrow characterization of Plaintiffs' allegations regarding Gaia's and Mr. De Stefano's conduct.

The Colorado Supreme Court has "never attempted to rigidly define 'improper' for all purposes of interference with contract," *Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016), and the question "depends on the facts of each case," *Watson v. Settlemeyer*, 372 P.2d 453, 456 (Colo. 1962).  *See also Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1196 (Colo. App. 2009) (noting that Colorado courts consider the factors listed in the Restatement (Second) of Torts § 767 to determine whether interference is improper, including, *inter alia*, the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, and the proximity or remoteness of the actor's conduct to the interference).

Viewing the allegations in the light most favorable to Plaintiffs, as it must, the Court finds that Plaintiffs have sufficiently alleged that Gaia acted improperly in producing *Initiation* after it learned of the "exclusive agreement" between Antarctica and Mr. De Stefano regarding *El Recordador.  See, e.g.*, [Doc. 28 at ¶¶ 30, 34].  In sum, the Court concludes that Plaintiffs have adequately pled their intentional interference with contract claim under Count V.

---

'certain or substantially certain' to occur due to its purported knowledge of the Management Agreement . . . because the [First Amended Complaint] fails to plausibly allege knowledge of the agreement, and it also fails to allege knowledge that interference was certain to occur")].

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Defendant Gaia, Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint

[Doc. 34] is **DENIED**.

DATED: March 20, 2023                         BY THE COURT:

_____

Nina Y. Wang

United States District Judge